PEOPLE v PARKER

PEOPLE v MITCHELL

1. HOMICIDE—FIRST-DEGREE MURDER—SECOND-DEGREE MURDER— NOLO CONTENDERE PLEAS—SETTING ASIDE PLEAS.

A trial court may set aside a defendant's plea of nolo contendere to second-degree murder where the defendant was originally charged with first-degree murder and permit the prosecutor to proceed against the defendant on the original charge of first-degree murder where the defendant seeks to have his nolo contendere plea set aside prior to sentencing.

2. CONTINUANCES—ADJOURNMENTS—TRIAL COURT'S DISCRETION— GOOD CAUSE.

Requests for adjournments or continuances are addressed to the trial court's discretion, and absent an abuse of this discretion the decision will not be overturned; adjournments or continuances are not to be granted except for good cause shown.

3. CRIMINAL LAW—TRIAL—JOINDER—SEPARATE TRIALS—TRIAL COURT'S DISCRETION—ABUSE OF DISCRETION.

A defendant does not have a "right" to a separate trial, and joinder rests within the discretion of the trial judge; a defend-

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 498.

29 Am Jur 2d, Evidence §§ 526, 702.

Plea of nolo contendere or non vult contendere. 89 ALR2d 540.

[2] 17 Am Jur 2d, Continuance §§ 3, 4.

[3, 4] 75 Am Jur 2d, Trial §§ 17, 18, 21, 23, 24.

[5–7] 29 Am Jur 2d, Evidence § 436.

[8, 9] Admissibility of sound recordings in evidence. 58 ALR2d 1024.

21 Am Jur 2d, Criminal Law § 236.

[10] 75 Am Jur 2d, Trial § 305.

[11] 40 Am Jur 2d, Homicide §§ 263–267.

[12, 13] 81 Am Jur 2d, Witnesses § 668.

[14] 75 Am Jur 2d, Trial § 906.

[15] 21 Am Jur 2d, Criminal Law § 128.

[16] 40 Am Jur 2d, Homicide § 496.

Duty of trial court to instruct on self-defense, in absence of request by accused. 56 ALR2d 1170.

ant predicating error upon having been tried jointly with another defendant must demonstrate that the court abused its discretion in denying a motion for a separate trial.

4. CRIMINAL LAW—SEPARATE TRIALS—MOTIONS FOR SEVERANCE—CO-DEFENDANT'S EXTRAJUDICIAL STATEMENTS—TRIAL COURT'S DISCRETION—FACTORS.

A motion for severance on the ground that a codefendant has made extrajudicial statements implicating the movant is addressed to the sound discretion of the trial court; an abuse of discretion is not shown where the court weighed the following factors in reaching its decision to deny a motion for severance: (1) the codefendant's testimony was substantially in accord with his statements, (2) none of the codefendant's statements inculpated the defendant movant, (3) the extent to which the co-defendant's defenses were antagonistic, (4) the weight and sufficiency of the evidence independent of the extrajudicial statements, and (5) a limiting instruction requested by the movant was given by the court tending to negate the alleged prejudice.

5. EVIDENCE—CRIMINAL LAW—ADMISSIBILITY—SOUND RECORDINGS—FOUNDATION.

The proper foundation for admission of sound recordings into evidence consists of: (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement; each of these requirements must be met in any case to which it applies.

6. EVIDENCE—CRIMINAL LAW—SOUND RECORDINGS—INTELLIGIBIL-ITY—ADMISSIBILITY—TRIAL COURT'S DISCRETION.

Unless the unintelligible portions of a tape recording, which is otherwise admissible in evidence, are so substantial as to render the recording as a whole untrustworthy, the recording is admissible and the decision whether to admit it should be left to the sound discretion of the trial judge.

7. EVIDENCE—HOMICIDE—FIRST-DEGREE MURDER—SOUND RECORD-INGS—STATE OF MIND—SELF-DEFENSE.

A tape recording of a call made by the decedent to the police may be properly admitted in a trial for first-degree murder for the

limited purpose of showing the decedent's fearful state of mind immediately before he was killed to rebut the defendant's contentions that the decedent was the aggressor and that the defendant shot him in self-defense.

8. CRIMINAL LAW—MISTRIALS—JURY—PREJUDICE—NEWSPAPER ARTICLES.

It is not error to refuse to declare a mistrial where a defendant contends that he has been prejudiced by the exposure of some jury members to a newspaper article regarding the defendant's case, where: (1) the trial judge questioned each juror who had seen the article individually out of the presence of the jury, (2) each juror who had seen the article firmly denied any recollection or knowledge whatsoever of its contents, and (3) each juror who had seen the article was unequivocally of the opinion that he could decide the case solely on the evidence presented in court.

9. JURY—CRIMINAL LAW—PREJUDICE—MISTRIALS—ABUSE OF DISCRETION—EXPOSURE TO NEWSPAPER ARTICLES.

The mere probability or supposition that jurors may have read prejudicial accounts of the case on which they are serving is not sufficient to support a finding that the trial court abused its discretion in refusing to grant a mistrial for alleged prejudice as a result of such exposure.

10. CRIMINAL LAW—PROSECUTORS—DEFENDANT AS WITNESS—MISREPRESENTATION OF TRUTH—LIES—COMMENTS ON EVIDENCE—CONFLICTING TESTIMONY.

It is not reversible error where a prosecutor refers to portions of a defendant's testimony as a "lie" or a "fairy tale" in order to call a conflict in the evidence in the case to the jury's attention where the proofs indicate that the accused has in fact misrepresented the truth; the fact that the prosecutor phrased his argument in words not as delicate as an Oxford don might have used does not require reversal.

11. HOMICIDE—MURDER—SOURCE OF WEAPON—INFERENCES OF OTHER CRIMES—ADMISSIBILITY OF EVIDENCE—PREMEDITATION.

The determination of the source of a weapon in a murder prosecution is relevant to the case and the fact that the defendant might have procured the weapon by means which would create an inference of criminal conduct does not thereby render such evidence inadmissible; therefore, a prosecutor's questions concerning whether the defendant stole the gun used in the commission of a homicide from his employer were not improper

where there was testimony by the owner of the gun from which it could be inferred that the defendant was discharged from his employment shortly before the shooting and was therefore not carrying the gun in the course of his employment, such evidence being relevant to the issue of premeditation.

12. WITNESSES—CRIMINAL LAW—CHARACTER WITNESSES—TRUTH AND VERACITY—CROSS-EXAMINATION—RESTRICTIONS ON QUESTIONING.

The credibility of a character witness whose testimony is restricted to the defendant's reputation for truth and veracity may not be tested on cross-examination as to any other subject.

13. WITNESSES—CRIMINAL LAW—CHARACTER WITNESSES—PROSECUTORS—TRUTH AND VERACITY—RESTRICTIONS ON QUESTIONING.

It is improper for a prosecutor to ask a character witness whose testimony is restricted to the defendant's reputation for truth and veracity whether the defendant had a reputation for carrying a weapon; such questioning is not grounds for reversal, however, where: (1) the question was not completed, (2) the question was withdrawn after prompt defense objection, (3) the defendant had previously testified that he frequently carried the gun home from work thereby supplying the factual basis for the question with his own testimony, and (4) the question didn't impute to the defendant prior criminal acts similar to the one with which he was charged.

14. APPEAL AND ERROR—CRIMINAL LAW—JURY INSTRUCTIONS—MANIFEST INJUSTICE—ELEMENTS OF CRIME.

The failure to object at trial to alleged errors in the jury instructions precludes reversal on appeal absent manifest injustice or a failure to instruct as to all of the elements of the crime.

15. CRIMINAL LAW—AIDING AND ABETTING—CONVICTION OF PRINCIPAL—ACCESSORY.

A person may be prosecuted for aiding and abetting without regard to the conviction or acquittal of the principal and the conviction of the principal is not necessary to convict an accessory; what must be proven is that the crime was committed by someone and that the defendant either committed or aided and abetted the commission of the crime.

16. HOMICIDE—JURY INSTRUCTIONS—FIRST-DEGREE MURDER—ADMISSIONS OF CODEFENDANTS—SELF-DEFENSE.

A defendant's request that the jury be instructed that the defendant making the request cannot be convicted of a higher crime than his codefendant should be granted in a trial for first-

degree murder where the codefendant has admitted the shooting but is claiming self-defense.

Appeal from Washtenaw, Edward D. Deake, J. Submitted May 4, 1977, at Lansing. (Docket Nos. 25307, 25466.) Decided July 6, 1977.

Joseph H. Parker and Philman A. Mitchell were convicted of second-degree murder. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, *John J. Hensel,* Senior Assistant Prosecuting Attorney, Chief of Appellate Division, and *Robert L. Cooper,* Assistant Prosecuting Attorney, for the people.

*Jack J. Garris,* for defendant Joseph Parker.

*E. Spaulding Clark,* for defendant Philman Mitchell.

Before: DANHOF, C. J., and R. B. BURNS and E. A. QUINNELL,* JJ.

DANHOF, C. J. Defendants were charged with first-degree murder, MCLA 750.316; MSA 28.548, and, after a lengthy jury trial, they were convicted of second-degree murder, MCLA 750.317; MSA 28.549. Each defendant was sentenced to a term of from 17-1/2 years to 30 years imprisonment, and now appeals by right.

The slaying occurred at the home of Harriet Shimko. Ms. Shimko was romantically involved with both the victim, Daniel Reddic, and defendant Parker. Reddic was a black man; Ms. Shimko and defendants are white.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

On the evening of September 16, 1973, Mr. Reddic and Ms. Shimko had retired to the upstairs bedroom of Ms. Shimko's Ann Arbor townhouse when defendants Parker and Mitchell arrived. Mitchell was armed with a gun. After Parker observed Reddic and Ms. Shimko together in her bedroom and went back downstairs, Reddic went into the children's bedroom to call the police and to hide from defendants. Meanwhile, defendant Mitchell had come upstairs and determined that the stairway was "the only way out". After allowing David Hayes and Mary Bielecki (Ms. Shimko's live-in babysitter) to leave, defendant Parker returned upstairs and beat Ms. Shimko to force her to divulge where "that nigger" was. When Ms. Shimko finally revealed that Reddic was in the children's bedroom, defendant Parker relayed that information to defendant Mitchell. Mitchell went and checked the children's bedroom, then returned and informed Parker that Reddic was not there. Parker continued beating Ms. Shimko until she finally revealed that Reddic was in the closet in the children's room. Parker said something to Mitchell, and moments later Ms. Shimko heard several shots. She later found Daniel Reddic at the bottom of the stairs, dead or dying from a wound caused by a bullet that entered his left chest just above the nipple, passed diagonally downward, ruptured his heart, and exited through his lower right flank, indicating that he was shot from above.

The facts will be further stated as they relate to each of the several issues raised on appeal.

I

Defendants first contend that the trial court erred in setting aside their pleas of nolo conten-

dere to second-degree murder and permitting the prosecutor to proceed against them on the original charge of first-degree murder. They contend that under *People v McMiller,* 389 Mich 425; 208 NW2d 451 (1973), the court having once accepted their pleas of nolo contendere to the lesser charge, the prosecutor was foreclosed from thereafter proceeding against them on the original charge.

It appears from the records of the plea withdrawal proceedings that defendants sought to have their pleas set aside prior to sentencing when they learned that their maximum sentences would be higher than they had anticipated when they tendered their pleas.[1] Accordingly, the *McMiller* rule has no application to this case. *People v Lewandowski,* 394 Mich 529; 232 NW2d 173 (1975), *People v Millard,* 394 Mich 99; 228 NW2d 783 (1975), *People v Moore,* 74 Mich App 195; 253 NW2d 708 (1977), *Moore v 9th District Judge,* 69 Mich App 16, 19–20; 244 NW2d 346 (1976). *People v McMiller, supra,* at 430–431, disposes of defendants' double jeopardy claims. There was no error.

## II

Defendants next raise related claims. Defendant Parker contends that reversible prejudice resulted from the trial judge's refusal to order separate trials because (1) use of defendant Mitchell's out-of-court statements at trial prejudiced defendant Parker and (2) defendant Mitchell's counsel was so inadequately prepared for trial that defendant

[1] Defendant Mitchell's attorney clearly moved on the record to set aside Mitchell's plea. Defendant Parker's attorney did not expressly so move, but it is clear from the record that Defendant Parker's plea was set aside with his consent, and without objection, pursuant to an extended conference in chambers referred to on the record. The setting aside of Parker's plea therefore conformed to the requirements of GCR 1963, 785.7(6)(b)(ii).

Parker's defense was prejudiced. Similarly, defendant Mitchell contends that he was prejudiced by denial of his counsel's motion for adjournment, which he sought because he assertedly had not had time to prepare properly for trial.

The second branch of defendant Parker's arguments can be considered along with defendant Mitchell's contention. At the hearing on the motion for adjournment, defense counsel stated that "any argument I may have on that motion is contained within the written motion". The motion itself merely recites that Mitchell's counsel "believes that an adjournment would be necessary to adequately prepare the defendant's defense". Although defense counsel did assert that "this is not a defense tactic to separate the trials in any way", he declined to respond to the prosecutor's arguments against the motion. In its ruling, the court noted that "every trial involves tactics", but concluded that there was "no reason for adjournment".

We recognize that difficulties confronted defense counsel when he was appointed to replace defendant's retained counsel, who was forced to withdraw because he had received a judicial appointment and was prohibited from practicing law. Nevertheless, defense counsel had over 30 days to prepare for trial, the court had indicated and demonstrated its willingness to cooperate with newly appointed defense counsel by making court files and transcripts available to him, and defense counsel agreed that he could avail himself of the work product of defendant's former attorney.

Requests for adjournments or continuances are addressed to the trial court's discretion, and absent an abuse of this discretion the decision will not be overturned. *People v Shuey,* 63 Mich App

666, 671; 234 NW2d 754 (1975), *People v Masonis,*
58 Mich App 615, 619; 228 NW2d 489 (1975),
*People v Carter,* 54 Mich App 69, 73; 220 NW2d
330 (1974). Adjournments or continuances are not
to be granted except for good cause shown. MCLA
768.2; MSA 28.1025, GCR 1963, 503.1. In the pres-
ent case defendant did not claim that he was being
deprived of his right to counsel, as in *People v
Charles O Williams,* 386 Mich 565, 573; 194 NW2d
337 (1972), nor that he was being deprived of
compulsory process, as in *People v Merritt,* 396
Mich 67, 80–81; 238 NW2d 31 (1976). Indeed, de-
fense counsel advanced no reasons or circum-
stances whatsoever in support of his bald assertion
that an "adjournment would be necessary to ade-
quately prepare the defendant's defense",[2] nor does
the record reveal any. To the contrary, the record
reveals that Mitchell's counsel proceeded to trial
without renewing his motion or indicating in any
way that he remained unprepared, and that he
conducted a vigorous defense. Under these circum-
stances, and applying the standards set out in
*Williams, supra,* we find no abuse of discretion,
and consequently no error on which to predicate
reversal. See *People v Carter, supra, People v
Calhoun,* 17 Mich App 401, 402; 169 NW2d 505
(1969).

A defendant does not have a "right" to a sepa-
rate trial; rather, joinder rests within the discre-
tion of the trial judge. *People v Hurst,* 396 Mich 1,
6; 238 NW2d 6 (1976), *People v Foster,* 51 Mich
App 213, 215; 214 NW2d 723 (1974), MCLA 768.5;

[2] At the May 15, 1975 hearing, at which defense counsel made his
oral motion for adjournment, he did state that in the week since his
appointment he had been unable to interview his client or to obtain a
copy of the preliminary examination transcript. The court observed
that defendant was incarcerated, and therefore available, and
promptly provided defense counsel a copy of the preliminary exami-
nation transcript by order dated May 22, 1975.

MSA 28.1028. A defendant predicating error upon having been tried jointly with another defendant must demonstrate that the court abused its discretion in denying a motion for separate trial. *People v Moore,* 306 Mich 29, 38; 10 NW2d 296 (1943), *People v Rogers,* 39 Mich App 157, 161; 197 NW2d 292 (1972). A motion for severance on the ground that a codefendant has made extrajudicial statements[3] implicating the movant is likewise addressed to the sound discretion of the trial court. *People v Campbell,* 301 Mich 670, 673–674; 4 NW2d 51 (1942), 75 Am Jur 2d, Trial, § 17, p 133, Anno: *Right to severance where codefendant has incriminated himself,* 54 ALR2d 830, 833–834.

In determining whether a separate trial ought to have been granted, several factors must be weighed. First, we note that in his testimony Mitchell retraced the history of the statements he had made concerning the origin of his wound, explaining that he was confused and weakened by loss of blood after having been shot. Thus his testimony was substantially in accord with his statements, a factor weighing against a finding of abuse of discretion. Anno: 54 ALR2d, *supra,* at 863, particularly since there was no objection to the use of the "snake bite" statements. *People v Campbell, supra,* at 674.

Secondly, none of Mitchell's statements incul-

---

[3] Defendant Parker complains of the use of three statements by Mitchell: Mitchell's statement to the effect that the gunshot wound to the buttock that he received during the shooting was a snake bite; his later statement that he had actually been wounded when he was shot while running away; and his statement that he and Parker left the apartment where the shooting occurred immediately after they arrived when a black man came running down the stairs, and that he found the .38-caliber revolver used in the slaying lying on the ground outside the apartment as they were leaving. The trial court held an evidentiary hearing and correctly ruled that Mitchell's statement concerning his presence at the apartment was voluntary and hence admissible.

pated defendant Parker; indeed, only one of the statements related directly to defendant Parker, and it tended to exculpate him. As defendant Parker concedes on appeal, Mitchell's statements were "neither confession nor admission", and after examining with care his brief on appeal, we note that defendant Parker advances not one reason to support his claim that he was prejudiced by their admission. We agree with him that "the only purpose these statements could serve would be impeachment of Mitchell's testimony".

A third factor is the extent to which the co-defendants' defenses were antagonistic. Anno: 54 ALR2d, *supra,* at 858. In the present case it is clear that they were not antagonistic. Parker did not take the stand, and there is no indication from either the course of examination by respective defense counsel, nor from their arguments, that Parker sought to defend on a theory different from Mitchell's. An additional factor, the weight and sufficiency of the evidence, independent of the statements, also militates in this case against a finding of prejudice. Anno: 54 ALR2d, *supra,* at 855.

Finally, the trial court gave the limiting instructions requested by defendant Parker, to the effect that statements made by a defendant during or after arrest are to be received with great caution, and that it was the duty of the jury "to consider the case of each defendant separately as though he were on trial here alone", and that to convict defendants "it is necessary that evidence should be given against each one of them". Such instructions further tend to negate the alleged prejudice to defendant Parker. *People v Campbell, supra,* at 674.

Under these circumstances, we hold that defend-

ant Parker was not prejudiced by the admission of Mitchell's statements and that therefore the trial court did not abuse its discretion in denying defendant Parker's motion for severance.

## III

A tape recording of a telephone call by the victim to the police[4] on the night of the shooting was admitted in evidence over defense objection. Defendants contend that this was error because an insufficient foundation was laid for the tape's admission. We disagree.

*People v Taylor,* 18 Mich App 381, 383–384; 171 NW2d 219 (1969), *aff'd,* 386 Mich 204; 191 NW2d 310 (1971), sets forth the foundational requirements for the admission of sound recordings:

"(1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement."[5]

Although all seven foundational requirements must be met in any case to which all seven apply, it is conceded, and we agree, that the seventh requirement, "a showing that the testimony eli-

---

[4] Daniel Reddic telephoned the police to request emergency assistance because there was a "man outside with a gun". Reddic was shot within a few minutes after he made the telephone call.

[5] These foundational requirements were adopted, without modification, from Anno: *Admissibility of sound recordings in evidence,* 58 ALR2d 1024, 1027–1028.

cited was voluntarily made without any inducement", has no application to this case.[6]

That the foundational rules of *Taylor* are flexible enough to meet the facts and circumstances of a given case is demonstrated by *People v Frison,* 25 Mich App 146; 181 NW2d 75 (1970), in which this Court held that a tape containing background noise that made understanding the recording difficult was not so unintelligible that its admission was reversible error. The Court quoted with approval the rule that "unless the unintelligible portions of a tape recording are so substantial as to render the recording as a whole untrustworthy, the recording is admissible and the decision whether to admit it should be left to the sound discretion of the trial judge". *Id,* 148. *Frison* disposes of defendants' contention that certain inaudible portions of the tape rendered it inadmissible. We have audited the tape in question, and we agree with the trial judge that the assertedly unintelligible portions of the tape are not so substantial as to render the recording as a whole untrustworthy. The tape was properly admitted to show Reddic's fearful state of mind immediately before he was killed, to rebut the defense contention that Reddic was the aggressor and that Mitchell shot him in self-defense. See *People v Freeman,* 32 Mich App 321, 323; 188 NW2d 200 (1971). Bearing in mind the limited purpose for which the recording was admitted, we observe that the fact that small portions of the tape are inaudible is entirely consistent with the behavior of a desperate man whispering a plea for help into a tele-

---

[6] Application and satisfaction of such a requirement would be appropriate, however, before admitting a recording of a defendant's confession or admission, the extrajudicial statement of a witness, or any other "testimony". Daniel Reddic's telephone call was not used as "testimony", as such; the tape was admitted only to show the state of mind of the victim immediately before the shooting.

phone while hiding in a darkened bedroom. Ms. Shimko heard Reddic's end of the conversation, and testified that she heard him state, over the telephone, that he needed help. That statement also appears on the tape. Moreover, our own review of the recording itself reveals that almost all parts of the tape were audible. We hold that the correctness of the recording was adequately demonstrated.

It is sufficient to state that foundational requirements (3) through (6) were more than adequately established by the prosecution. Without over-elaboration, we note that Ms. Shimko corroborated the authenticity of the recording based on her own presence during the call. Communications Officer McAllister, who was in charge of the tape, testified in considerable detail as to the precautions taken to prevent changes, additions or deletions, which included having both defense counsel present when a copy of the tape was made for use at trial. Similarly, he fully described the procedures he followed in storing and retrieving the tape to establish the manner in which it was preserved. Finally, three witnesses familiar with the victim identified the voice on the tape as his, and the communications officer identified the voices of the officers who answered the victim's call.

With regard to requirements (1) and (2), McAllister testified that he had encountered no trouble with the machine, that the multiple track recorder had been used to monitor automatically all incoming telephone calls and all police radio traffic, and that the machine was so used without incident in the ordinary course of departmental business. From the entire record made in laying the foundation for admission of this recording, and from the foregoing testimony, we hold that, in the

absence of any reason to doubt that the recording machine was capable of recording testimony, there was a sufficient showing that this recording device was capable of taking testimony. Similarly, to the extent that foundation requirement (2) applies to the facts of the case at bar, we hold that Mc-Allister's testimony that the machine under his control *automatically* recorded all incoming telephone calls by means of direct connections between the telephones and the multiple tracks of the machine, together with his demonstrated ability to explain how the machine functioned and his account of the procedure he followed in tending the machine, satisfied the requirement that there be a showing that the operator of the device was competent.[7] Therefore admission of the tape was not error.

## IV

Defendants next contend that they were entitled to a mistrial when it was brought to the attention of the trial judge on the fourth day of trial that two jurors[8] had been exposed to an Ann Arbor

---

[7] Strictly speaking, of course, the machine had no operator, since it functioned automatically. McAllister merely tended the machine by changing the tape reel every 24 hours and checking its functioning. Although it always would be proper to require a showing that the operator of a manual recording device was competent to operate it, the showing in this case that the machine had functioned automatically without incident, and that it was regularly tended by one knowledgeable about the machine's functioning, satisfies the competence requirement, in the absence of any reason to doubt that the machine was functioning properly. In adapting the foundational requirements of *People v Taylor,* 18 Mich App 381; 171 NW2d 219 (1969), to the facts of each case, the primary considerations should be to ensure the accuracy, authenticity, and integrity of the recording itself, and, in appropriate cases, the voluntariness of the testimony recorded.

[8] Three other jurors had been informed by family members of the existence of the article, but had scrupulously avoided learning its contents.

News article containing an account of the trial. Defendants contend that the potential for prejudice resulting from juror exposure to this article, which recited that defendants had each pled "no contest to a charge of second degree (unpremeditated) murder", but had been permitted to withdraw their pleas after learning that they might be sentenced to life imprisonment, was so great that a mistrial should have been granted whether or not the jurors remembered the contents of the article.

After he determined that some members of the jury had been exposed to the article, the trial judge dismissed the jury. The trial judge and defense counsel then questioned individually each juror who had any knowledge about the article. The two jurors who had actually seen the article firmly denied recalling its contents, each having set the newspaper aside immediately upon realizing that the article referred to the case in which they were serving. Since neither juror could recall the contents of the article, they were unequivocally of the opinion that they could decide the case solely on the evidence presented in court.

Under these circumstances, the cases relied upon by defendants do not require us to hold that the trial judge erred in refusing to declare a mistrial. In those cases the jurors, who had been exposed to incompetent information contained in newspaper accounts of trials in which they were serving, merely denied that they would be prejudiced thereby. See, *e.g., Marshall v United States,* 360 US 310; 79 S Ct 1171; 3 L Ed 2d 1250 (1959), *Coppedge v United States,* 106 US App DC 275; 272 F2d 504 (1959) (trial judge failed to examine individually the jurors who had been exposed to the article). In *People v Moreland,* 12 Mich App

483, 488; 163 NW2d 257 (1968), this Court held that defendant's conviction must be reversed because of the fundamental injustice that resulted when the jury actually discussed and considered the defendant's prior convictions, which were disclosed in a newspaper article they had seen, during the course of their deliberations. *People v Trombley*, 67 Mich App 88; 240 NW2d 279 (1976), in which the prosecutor put the fact of defendant's prior guilty plea before the jury in the course of impeaching defendant, is also inapposite. In the present case, the only two jurors who were directly exposed to the article containing similar information denied any recollection whatsoever of its content.

The instant case presents facts more akin to those in *People v Hawthorne*, 293 Mich 15, 21; 291 NW 205 (1940), in which an open newspaper containing an account of the case was found in the jury room and each juror denied that he had read that or any other article about the case. The Court held that there was no error under such circumstances and affirmed the conviction, which suggests that a showing of mere potential for prejudice is insufficient to warrant granting a mistrial. See *People v McCrea*, 303 Mich 213, 265; 6 NW2d 489 (1942). In *People v Herbert Smith*, 34 Mich App 205; 191 NW2d 392 (1971), *aff'd*, 396 Mich 362; 240 NW2d 245 (1976), three jurors had read a newspaper account that stated the defendant had not been permitted to plead guilty to a lesser charge, was then serving a sentence on another charge, and had engaged in bizarre behavior during the proceedings, but stated that they would not be influenced by the article. This Court held that the trial judge had adequately instructed the jury to disregard the contents of the newspaper

article and decide the issues and render their verdict entirely on the basis of the evidence offered in court, and that therefore it was not error to refuse to declare a mistrial.[9] The mere probability or supposition that jurors may have read prejudicial accounts of the case on which they are serving is not sufficient to support a finding that the trial court abused its discretion in refusing to grant a mistrial. *People v Green,* 323 Mich 128, 131–132; 35 NW2d 142 (1948), *People v Havey,* 11 Mich App 69, 75; 160 NW2d 629 (1968). Under the circumstances of this case, in which all jurors who were aware of the article's publication disclaimed any knowledge or recollection of its contents, we hold that the trial judge did not abuse his discretion in refusing to declare a mistrial.

## V

Defendants contend that several instances of alleged prosecutorial misconduct were so prejudicial as to deny them a fair trial and that they are therefore entitled to a new trial. As defendants' contentions are without merit, we will discuss only briefly the principal instances of asserted error.

First, the prosecutor's reference to portions of Mitchell's testimony, which was at odds with the testimony of prosecution witnesses in almost all respects, as a "lie" or a "fairy tale" did not constitute reversible error. When the proofs indicate that the accused has in fact misrepresented the truth, it is not error to call the conflict of the evidence to the jury's attention. *People v Wright,* 58 Mich App 735, 745–747; 228 NW2d 807 (1975).

---

[9] Since each juror questioned indicated that he or she had no knowledge of the contents of the article, such an instruction was unnecessary in this case, but the trial judge did issue a blanket order to abstain from reading or listening to any accounts of the case.

"The fact that the prosecutor phrased his argument in words not as delicate as an Oxford don might have used does not require reversal". *People v Couch,* 49 Mich App 69, 73; 211 NW2d 250 (1973).

Secondly, the prosecutor's questions concerning whether defendant Mitchell stole the gun used in the commission of the homicide from his employer were not improper. There was some testimony by the owner of the gun from which it could be inferred that Mitchell had been discharged from his employment shortly before the shooting occurred and that he was therefore not carrying the gun in the course of his employment, as he claimed. That being so, it would be relevant to the issue of premeditation to show that Mitchell procured the weapon for the purpose of confronting his victim with it:

"Determination of the source of a weapon in a murder prosecution is relevant to the case and the fact that defendant might have procured the pistol by means which would create an inference of criminal conduct does not thereby render such evidence inadmissible." *People v Skidmore,* 28 Mich App 677, 679; 185 NW2d 137 (1970).

Accord, *People v Wood,* 44 Mich App 99, 101–102; 205 NW2d 66 (1972).

Thirdly, defendants contend that the prosecutor improperly cross-examined a character witness for defendant Mitchell. It is true that the credibility of a character witness whose testimony is restricted to the defendant's reputation for truth and veracity may not be tested on cross-examination as to any other subject. *People v McClow,* 40 Mich App 185, 195; 198 NW2d 707 (1972). Thus it was

improper for the prosecutor to ask the witness whether defendant Mitchell had a reputation for carrying a weapon. The question was not completed, however, and was withdrawn after prompt defense objection. Moreover, Mitchell himself had previously testified that he frequently carried the gun home with him after work; thus Mitchell's own testimony supplied a factual basis for the question, unlike *McClow, supra,* at 196, and also negated the possibility that any prejudice resulted from the prosecutor's uncompleted question. Also, again unlike *McClow,* the question posed in this case did not impute to Mitchell prior criminal acts similar to that with which he was charged. Under these circumstances, the question was not grounds for reversal. *McClow, supra,* at 195.

Defendants' remaining assertions of prosecutorial misconduct do not warrant extended discussion. It is sufficient to observe that although the prosecutor's brief questioning of defendant Mitchell's former employer concerning prior occasions on which Mitchell had shot the gun was irrelevant, since Mitchell did not claim that he discharged the gun accidentally, any error was undoubtedly harmless in light of the overwhelming testimony and evidence establishing that Mitchell was the aggressor. The remaining claims of inflammatory argument and questioning may be disposed of by observing that the prosecutor's questions and remarks were closely related to supporting evidence, and therefore did not constitute error. *People v Page,* 63 Mich App 177, 179–180; 234 NW2d 440 (1975), *People v Clark,* 57 Mich App 339, 343; 225 NW2d 758 (1975), see *People v Davis,* 57 Mich App 505, 511–513; 226 NW2d 540 (1975). Defendants' remaining assignments of prosecutorial misconduct are too frivolous to merit discussion.

## VI

Lastly, defendants contend that the trial judge's instructions on aiding and abetting and the possible verdicts were so misleading as to be reversibly erroneous. We disagree.

Defendants failed to object to the instructions of which they now complain; therefore there can be no reversal in the absence of manifest injustice, *People v Fields,* 64 Mich App 166, 171; 235 NW2d 95 (1975), *People v Hooper,* 50 Mich App 186, 192; 212 NW2d 786 (1973), or a failure to instruct as to all the elements of the crime. *People v Miller,* 35 Mich App 627; 192 NW2d 517 (1971). Neither basis for reversal is present here.

On aiding and abetting, the trial judge instructed:

"[A]ll parties who are concerned in the commission of the felony whether they directly commit the act constituting a felony or aid and abet in its commission are held to be equally responsible, so that whether a party commits by himself the entire act which constitutes a felony, or if he is concerned with another in its commission, if he aids another in its commission, if he assists another in its commission by word or deed, either by words of encouragement, assistance, or support, or by actions giving encouragement, assistance, or support, either party under these circumstances would in the eyes of the law be held to be equally responsible, that is so far as their personal guilt or innocence is concerned. Mere presence even with knowledge that an offense is about to be committed or is being committed is not enough to make a person an aider and abettor or principal, nor is mere mental approval sufficient, nor passive acquiescence or consent. One cannot be held criminally responsible for another's wrong in which he has taken no part."

The trial judge also instructed that the jury was to

consider the case of each defendant separately, that either or both defendants could be convicted or acquitted, but that "under no circumstances may you find Joseph Parker guilty of a higher offense than Philman Mitchell if you do find him guilty of any offense". Defendant Parker was tried as a principal, on an aiding and abetting theory, and his attorney requested the instruction last quoted.

Defendant Parker's contention, that the trial judge's instructions were erroneous because they permitted the jury to find Parker guilty on an aiding and abetting theory before considering the principal's guilt, is disposed of by the holding in *People v Burgess,* 67 Mich App 214, 217; 240 NW2d 485 (1976):

"The trial court twice instructed the jury that a defendant could be held criminally responsible for a felony if, by his actions, he aided or abetted another in the felony's commission. Thus, the jury was informed that another individual's direct commission of the felony was a condition precedent to finding the aider and abetter [sic] guilty. Consequently, before the jury could conclude that the defendant was guilty as an aider and abetter [sic] of either the charged offense or one of the lesser included offenses, it was necessary for them to determine that the principal had, in fact, directly committed that felony."

Furthermore, since a person may be prosecuted for aiding and abetting without regard to the conviction or acquittal of the principal, it follows that the conviction of the principal is not necessary to convict an accessory. *People v Mann,* 395 Mich 472, 478; 236 NW2d 509 (1975).

"What must be proven, however, is that the crime was committed by someone, and that the defendant

either committed or aided and abetted the commission of that crime." *Id.*

There was no error.

Defendant Mitchell[10] claims that the trial judge's instruction that the jury must consider separately the question of each defendant's guilt conflicted with his instruction that defendant Parker could be convicted, if at all, of no higher offense than defendant Mitchell. Although there is authority to suggest that, under certain circumstances, an aider and abettor may be convicted of a higher offense than the principal, see, *e.g., People v Chamblis,* 395 Mich 408, 421; 236 NW2d 473 (1975), *People v Folkes,* 71 Mich App 95, 97–99; 246 NW2d 403 (1976), 21 Am Jur 2d, Criminal Law, § 123, p 199, 40 Am Jur 2d, Homicide, § 33, p 325, 22 CJS, Criminal Law, § 106, p 297, there is no need for abstract discussion of that question here. In this case, defendant Mitchell admitted the shooting, but claimed self-defense. Accordingly it would have been error for the trial judge to have denied defendant Parker's request for an instruction to the effect that he could not be convicted of a higher crime than Mitchell. See *People v Pearce,* 369 Mich 692; 120 NW2d 838 (1963), *People v Onesto,* 203 Mich 490, 496; 170 NW 38 (1918). Moreover, even assuming *arguendo* that once the jury found against Mitchell on his claim of self-defense they might have been disposed to convict defendant Parker of a higher offense than Mitchell, the only possible consequence of the trial court's instruction would have been to benefit Parker. We therefore hold that under the circumstances of this case the instruction was proper and that no injustice to either defendant is manifest.

The convictions are affirmed.

---

[10] Defendant Parker also cursorily advances this argument; our discussion of Mitchell's claim disposes of Parker's as well.